TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
MICHAEL J. MADIGAN
Trial Attorney, Special Matters Unit, Fraud Section
Criminal Division, U.S. Department of Justice
    1400 New York Avenue NW
    Washington, DC 20530
    Telephone: (202) 262-7641
    Facsimile: (202) 514-0152
E-mail: Michael.Madigan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:19-CR-00527-ODW |
| Plaintiff, | GOVERNMENT FILTER TEAM'S OPPOSITION TO DEFENDANTS SARA SOULATI AND DR. RONALD S. WEAVER'S JOINT MOTION TO SUPPRESS AND SEVER AND REQUEST FOR AN EVIDENTIARY HEARING |
| v. | |
| RONALD SEYMOUR WEAVER, SARA SOULATI, et al., | |
| Defendants. | DATE: May 9, 2022<br>TIME: 10:00 AM<br>CTRM: 5D<br>JUDGE: Hon. Otis D. Wright |

The United States, by and through its counsel of record, the Fraud Section of the United States Department of Justice, hereby files this Opposition to Defendants Sara Soulati and Dr. Ronald S. Weaver's Joint Motion to Suppress and Sever and Request For An Evidentiary Hearing. (Dkt. 396.) The United States respectfully requests that this Court deny defendants' motion.

This Opposition is based on the attached memorandum of points and authorities, the

files and records in this case, and such further evidence and argument as this Court may permit.

Dated: April 4, 2022.

Respectfully submitted,

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section

/s/
MICHAEL J. MADIGAN
Trial Attorney, Special Matters Unit
Fraud Section, Criminal Division
United States Department of Justice

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

I.      INTRODUCTION ……………………………………………………...1

II.     STATEMENT OF FACTS………………………………………………...2

III.    ARGUMENT……………………………………………………… ....6

    A.     SUPPRESSION OF EVIDENCE IS UNJUSTIFIED, AS
          THE GOVERNMENT COMPLIED WITH THE SEARCH
          WARRANT'S FILTER REQUIREMENTS AND DID NOT
          ACT IN "FLAGRANT DISREGARD" OF THE TERMS
          OF THE SEARCH WARRANT………………………..……………..………...6

    B.     SEVERANCE OF THE MOVING DEFENDANTS IS
          UNJUSTIFIED BECAUSE THE PARTIES' DEFENSES ARE
          NOT SO ANTAGONISTIC AS TO OUTWEIGH THE FEDERAL
          PREFERENCE FOR JOINT TRIALS………………………………….......9

        1.     THE MOVING DEFENDANTS HAVE FAILED TO
               JUSTIFY SEVERANCE…………………………………… ...9

        2.     THE MOVING DEFENDANTS HAVE FAILED TO
               DEMONSTRATE THAT THE PARTIES'
               RESPECTIVE DEFENSES ARE SO
               IRRECONCILABLE AS TO JUSTIFY SEVERANCE…………. .12

        3.     THE REQUEST FOR SEVERANCE IS PREMATURE………… .15

    C.     AN EVIDENTIARY HEARING IS UNNECESSARY…………………..16

IV.     CONCLUSION………………..…………..…………………..………….............. .18

1

## <u>TABLE OF AUTHORITIES</u>

2

**FEDERAL CASES**

3

*Brady v. Maryland*, 373 U.S. 83 (1963)…………………………………………... 2, 15

4

*Franks v. Delaware*, 438 U.S. 154 (1978) …………………………………………...17

5

*United States v. Angwin*, 271 F.3d 786 (9th Cir. 2001) ………………………...12, 13, 15

6

*United States v. Chen*, 979 F.2d 714 (9th Cir. 1992) ……………………………… 6

7

*United States v. Cote*, 72 M.J. 41 (A.F. Ct. Crim. App. 2013) …………………………9

8

*United States v. Debbi*, 244 F. Supp. 2d 235 (S.D.N.Y. 2003) …………….…………… 6

9

*United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) …………………10, 11, 12

10

*United States v. Harris*, 914 F.2d 927 (7th Cir. 1990) ………………………………… 17

11

*United States v. Hernandez-Orellana*, 539 F.3d 994 (9th Cir. 2008) …...…………… 12

12

*United States v. Howell*, 231 F.3d 615 (9th Cir. 2000) …………………………  16, 17

13

*United States v. Jenkins*, 633 F.3d 788 (9th Cir. 2011) ………...………………… 10

14

*United States v. Kinard*, 820 Fed. App'x 525 (9th Cir. 2020) ………………………… 10

15

*United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) …………………………………12

16

*United States v. Marcello*, 731 F.2d 1354 (9th Cir. 1984) …..………………………… 17

17

*United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012) ………………………… 9

18

*United States v. Rodriguez-Hernandez*, No. 05-50077,
2007 WL 135686 (9th Cir. Jan. 16, 2007)………...….…………….…………………… 17

19

*United States v. Shi Yan Liu*, 239 F.3d 138 (2d Cir. 2000) ………………………………6

20

*United States v. Throckmorton*, 87 F.3d 1069 (9th Cir. 1996) ………..…… 12, 13, 14, 15

21

*United States v. Woodson*, No. CR 11-00531 WHA,
2011 WL 5884913 (N.D. Cal. Nov. 23, 2011) …………………………...….………… 17

22

*Zafiro v. United States*, 506 U.S. 534 (1993) ………………………………… 9, 10, 12

23

**FEDERAL RULE:**

24

Fed. R. Crim. P. 14 ……………………………………………………… 9, 12

25

26

27

28

ii

## I.    Introduction

Defendants Sara Soulati and Ronald S. Weaver's ("Moving Defendants") joint motion to suppress evidence and to sever their trials from the cardiologist defendants (the "Cardiologists")[1] (Dkt. 396, the "Motion") should be denied.

First, blanket suppression of evidence is inappropriate because the Moving Defendants cannot show that the government "flagrantly disregarded" the privilege filter procedures set forth in the search warrant for 633 Aerick Street, Inglewood, California (the "Search Warrant"). Contrary to the Moving Defendants' claims, a filter review consistent with the Search Warrant's requirements *was* conducted by the government's filter team ("Filter Team")[2] prior to release and production of the seized materials. Far from the Moving Defendants' allegations of "flagrant disregard," the Filter Team (and the government as a whole) diligently and in good faith sought to preserve the Moving Defendants' privileged confidences. Moreover, when it became clear that some potentially privileged material ("PPM")[3] may have been inadvertently disclosed, the Filter Team (and the government as a whole) acted diligently and in good faith to remedy the issue.

Second, severance is inappropriate because the Moving Defendants have failed to demonstrate that joint trial here would either (1) involve any of the PPM in question, or

---

[1] Defendants Ronald Carlish, Howard Elkin, Wolfgang Scheele, and Nagesh Shetty are collectively referenced herein as the "Cardiologists." Defendant John Weaver, brother of movant Ronald S. Weaver, is excluded from the group of Cardiologists as defined here because he is not a cardiologist, because Moving Defendants assert that he shares a joint defense privilege with Ronald Weaver, and because they do not seek his severance. (Mot. at 1, n.1.)

[2] The Filter Team consists of attorneys and staff assigned from the U.S. Department of Justice, Criminal Division, Fraud Section's Special Matters Unit, and their predecessors performing the same function, who are responsible for reviewing materials for privilege and work product protections and ensuring that the prosecution team is not exposed to potentially protected material. The attorneys and staff on the Filter Team have a separate reporting and first-line supervisory chain from the prosecution team in this case. (Declaration of Bennett P. Starnes in Support of Government Filter Team's Opposition to Defendants Sara Soulati and Dr. Ronald S. Weaver's Joint Motion to Suppress and Sever and Request for an Evidentiary Hearing ["Starnes Decl."] ¶ 2.)

[3] Potentially protected material or "PPM" is defined as material that could potentially garner the protections of the attorney client privilege, work product doctrine, or other legally recognized privileges.

1  (2) assuming, *arguendo*, it did, that it would entail the type of prejudice federal courts

2  have found to justify severance—e.g., "serious risk" to either a specific trial right or to

3  the reliability of the jury's verdict or totally irreconcilable core defenses or assertions

4  regarding privilege. Moreover, severance at this time is premature, as, while PPM was,

5  indeed, inadvertently produced by the Prosecution Team to the Cardiologists, there has

6  not been any determination that any of the PPM is actually privileged,[4] nor whether the

7  Moving Defendants are entitled to withhold privileged material that the Cardiologists

8  may establish is material to their defenses under *Brady v. Maryland*, 373 U.S. 83

9  (1963).[5]

10      Finally, the Moving Defendants' request for an evidentiary hearing should be

11  denied.

12  ## II.  Statement of Facts

13      On January 11, 2018, the government executed the Search Warrant at the Global

14  Cardio Care clinic, located at 633 Aerick Street, Inglewood, CA 90301. (Declaration of

15  Van Nimitsilpa in Support of Government Filter Team's Opposition to Defendants Sara

16  Soulati and Dr. Ronald S. Weaver's Joint Motion to Suppress and Sever and Request for

17  an Evidentiary Hearing ["Nimitsilpa Decl."] ¶ 2.) As authorized by the Search Warrant,

18  the government made electronic copies (or "images") of digital files located on devices

19  maintained by three businesses connected to the Moving Defendants operating on site,

20  Ronald Seymour Weaver MD, Inc. ("RSW"), Global Cardio Care, Inc. ("GCC"), and

21  GCC Imaging, LLC ("GCC Imaging"). (Dkt. 1 ¶¶ 1–2.) (The digital materials seized

22  pursuant to the Search Warrant are hereinafter referred to as the "Seized Digital

23  Materials.") The Seized Digital Materials were promptly ingested into a Federal Bureau

24

---

25  [4] The question of whether Moving Defendants have adequately supported the privilege assertions on

26  their privilege logs is the subject of ongoing meet-and-confer efforts, as described in the government's recent filings. (*See e.g.*, Dkt. 395 at 9; Dkt. 411 at 4.)

27  [5] The question of whether the Cardiologists are entitled to production of some or all of the Moving Defendants' PPM, on grounds that it is relevant to the Cardiologists' defenses, is the subject of the

28  Cardiologists' pending motion to compel. (*See* Dkt. 335.) The Court heard argument on that motion on January 24, 2022 (*see* Dkt. 370), but has not yet ruled.

2

1  of Investigation ("FBI") database maintained by the FBI's Computer Analysis Response

2  Team ("CART"). (Nimitsilpa Decl. ¶ 2.)

3      The Search Warrant included protocols for the handling of PPM. (Mot., Ex. A,

4  Declaration of Vicki I. Podberesky ["Podberesky Decl."], at Attach. B-1, Sec. III, ¶¶ 7–

5  25.) In particular, for digital evidence like the Seized Digital Materials at issue here, the

6  Search Warrant required that the Filter Team[6] utilize a list of "privilege key words,"

7  such as the names of known attorneys and generic attorney-related words like

8  "privileged" or "work product" (the "Privilege Search Terms"). (*Id.* ¶ 14.) The Filter

9  Team was authorized to run these Privilege Search Terms across all the data contained in

10 each digital device capable of containing any of the items to be seized. (*Id.*) Documents

11 or data that were not identified by these Privilege Search Terms as PPM were permitted

12 to be released by the Filter Team. (*Id.*) Documents or data identified by the Privilege

13 Search Terms as PPM were to be withheld by the Filter Team, unless determined not to

14 be PPM via individual review of the document or ruled non-privileged or subject to a

15 privilege exception via judicial review. (*Id.* ¶ 15.)

16     As required by the Search Warrant, the Filter Team ran the Privilege Search

17 Terms across the Seized Digital Materials in the CART system before any Seized Digital

18 Materials were released to the Prosecution Team. (Nimitsilpa Decl. ¶ 3.) The Privilege

19 Search Terms used included names of known attorneys and general terms such as

20 "attorney" and "privilege." (*Id.*) Any documents on which the Privilege Search Terms hit

21 were segregated from the other Seized Digital Materials and retained by the Filter Team

22 in CART, as required by the Search Warrant. (*Id.*)

23     In November 2019, Trial Attorney Bennett Starnes from the Filter Team traveled

24 to Los Angeles, California to run quality control searches across a subset of material

25 remaining on the CART system. (Starnes Decl. ¶ 3.) There, he met Supervisory Special

26 Agent Forensic Examiner Van Nimitsilpa from CART, who showed him the interface

27

28

---

[6] The Search Warrant uses the synonymous term "Privilege Review Team."

3

station and provided him with a tutorial on running searches in the system and how it categorized material. (*Id.*) He spent that day and the next searching for Privilege Search Terms across the material remaining on the CART system to verify that the earlier cull had identified everything that hit on the Privilege Search Terms. (*Id.*) Starnes did not identify any PPM that had not previously been identified. (*Id.*)

Meanwhile the government had received requests from defense counsel for the Seized Digital Materials (and other materials) to be produced expeditiously and in native format. (*See, e.g.*, Dkt. 411-1 at 5–6 (Ex. A).) In order to respond to the defendants' requests for production of discovery as quickly as possible, in December 2019, the Prosecution Team produced directly from CART the non-Bates-numbered, native-format copies of the Seized Digital Materials that had cleared the Filter Team's protocols to any defendants who had supplied a portable hard drive (the "December 2019 Native Production"). (Podberesky Decl., Ex. D.) The December 2019 Native Production excluded over 70,000 documents that had been identified as PPM by running the Privilege Search Terms in CART. (Nimitsilpa Decl. ¶ 3; Starnes Decl. ¶ 4.) Accordingly, the Prosecution Team stated that the production hard drives contained "non-privileged . . . electronic documents" (*see, e.g.,* Podberesky Decl., Ex. D), as Privilege Search Terms had been run on the Seized Digital Materials in CART. (Nimitsilpa Decl. ¶ 3.)

The Seized Digital Materials were subsequently migrated from CART to the Relativity database, a document management system commonly used for discovery production and filter reviews. (Starnes Decl. ¶ 4.) Relativity provides robust tools for document management, including Bates-numbering, that were unavailable in the CART system. (*Id.* ¶ 4.) After migration of the Seized Digital Materials identified as PPM into Relativity, the Filter Team applied Bates numbering to it, in preparation for production of the PPM to the defendants who are the potential privilege holders for that material. (*Id.* ¶ 4.)

As an additional check to ensure that the Prosecution Team would not be exposed to any PPM, the Filter Team re-ran the Privilege Search Terms on the Seized Digital Materials in Relativity. (*Id.* ¶ 5.) This search resulted in the identification of 4,928 documents as PPM that had not been identified when the Privilege Search Terms had been run on the CART system, raising the possibility that PPM had been included in the December 2019 Native Production. (*Id.* ¶ 5.) The Filter Team moved those documents to the filter side of Relativity and began investigating this potential issue. (*Id.* ¶ 5.)

Meanwhile, on November 16, 2020, the parties filed a joint stipulation requesting entry of an order under Federal Rule of Evidence 502(d), which prescribed processes for release of documents as non-PPM, notification of discovery of PPM, and challenges to assertions of privilege. (Dkt. 249.) The Court entered an order implementing the parties' joint stipulation the same day. (Dkt. 250.)

The next day, the Prosecution Team made available to all defendants a Bates-numbered production in a Relativity load file of the 2,882,115 documents from the Seized Digital Materials identified as non-PPM after the Filter Team ran the Privilege Search Terms in Relativity. (Podberesky Decl., Ex. F at 2.) Excluded from that production were the 4,928 documents that had been identified as PPM when the Privilege Search Terms were run again in Relativity. (Starnes Decl. ¶ 5.)

On December 21, 2020, the Filter Team notified all defendants via letter of the existence of PPM in the December 2019 Native Production. (Podberesky Decl., Ex. G.) The Filter Team asked the Cardiologists to delete the documents identified as PPM from their systems. (*Id.*; Starnes Decl. ¶ 6.)

Defendant Soulati was provided with Bates-numbered copies of the 4,928 newly identified PPM documents to review for privilege. (Starnes Decl. ¶ 7.) Counsel for Soulati provided privilege logs on February 15, 2021, and May 12, 2021, asserting privilege claims over 3,372 of the 4,928 newly-identified PPM documents that had been included in the December 2019 Native Production. (*Id.* ¶ 7.)

1  **III.   ARGUMENT**

2  **A.   Suppression of Evidence Is Unjustified, as the Government Complied With the Search Warrant's Filter Requirements and Did Not Act in "Flagrant Disregard" of the Terms of the Search Warrant.**

3

4      As Moving Defendants concede, blanket suppression of all seized material, which

5  they seek, is only available if the government acted with "flagrant disregard" of the

6  terms of the Search Warrant. (*See* Mot. at 10) (citing *United States v. Chen*, 979 F.2d

7  714, 717 (9th Cir. 1992)). Blanket suppression is an "extraordinary remedy" that "should

8  be used only when the violations of the warrant's requirements are so extreme that the

9  search is essentially transformed into an impermissible general search." *Id.*; *see also*

10 *United States v. Debbi*, 244 F. Supp. 2d 235, 238 (S.D.N.Y. 2003) (stating blanket

11 suppression is a "drastic" remedy that is inappropriate except in "rare cases").

12     Indeed, the keystone Ninth Circuit case cited by the Moving Defendants, *United*

13 *States v. Chen*, reversed the district court's blanket suppression of seized materials

14 because it disagreed that the alleged warrant violation (installation of more surveillance

15 cameras than permitted by the warrant) was "extreme" enough to justify complete

16 suppression. *Id*. at 717, 720. In *Chen*, the Ninth Circuit held—in the context of an

17 alleged warrant violation related to the scope of the search, rather than privilege filter

18 issues—that the "standard for determining whether there has been a flagrant disregard

19 justifying wholesale suppression is whether the agents have disregarded the terms of the

20 warrant to such an extent that the search has been transformed into an impermissible

21 general search." *Id.* at 720. The Moving Defendants also cited the 2003 Southern District

22 of New York decision in *United States v. Debbi*, which explained that blanket

23 suppression is only appropriate where a search "greatly exceeds the bounds of the

24 warrant" and was "not conducted in good faith." 244 F. Supp. 2d at 238 (quoting *United*

25 *States v. Shi Yan Liu*, 239 F.3d 138, 141 (2d Cir. 2000) (internal quotation marks

26 omitted)). In *Debbi*, a Medicare fraud case, the court found that in a search of a home,

27 the government seized material well outside the scope of the warrant, including

28 "personal and religious files" and "general correspondence" and made only a limited

attempt to separate and return any out-of-scope documents. 244 F. Supp. 2d at 237–38. The court then found that items that the government had not determined to be evidence of the crimes under investigation would be suppressed. *Id.* at 238.

By contrast, in this case, there was certainly no such "flagrant disregard" of the terms of the Search Warrant. Indeed, the Moving Defendants' assertion that the government failed to conduct a filter review before releasing and producing the Seized Digital Materials (Mot. at 17)[7] is simply false. To the contrary, the government engaged a Filter Team to comply with the Search Warrant's requirements for a filter review. (*See* discussion, *supra*, at 3; Nimitsilpa Decl. ¶ 2.) The Search Warrant required that, for digital evidence like the Seized Digital Materials, a Filter Team utilize a list of "privilege key words." (Podberesky Decl., Ex. A at Attach. B-1, Sec. III, ¶¶ 14.) This is precisely what the Filter Team did here. The Filter Team ran Privilege Search Terms across the Seized Digital Materials in the CART system before any of the Seized Digital Materials were released to the Prosecution Team. (Nimitsilpa Decl. ¶¶ 2–3; *see* discussion, *supra*, at 3.) The Privilege Search Terms used by the Filter Team included names of known attorneys and general terms, such as "attorney" and "privilege." (Nimitsilpa Decl. ¶ 3.) The Filter Team segregated, as PPM, over 70,000 documents on which the Privilege Search Terms hit. (Starnes Decl. ¶ 4.) The Seized Digital Materials that were not identified as PPM through this filter review were released to the Prosecution Team, pursuant to the terms of the Search Warrant. (*Id.* ¶ 5.) The Prosecution Team then produced the released materials to all the defendants in the December 2019 Native Production, which was understood at the time to contain solely non-PPM. (Podberesky Decl., Ex. D.)

---

[7] The Moving Defendants inexplicably (and incorrectly) assert that "the *Prosecution Team* ignored the entire filter protocol by keeping possession of the potentially privileged material, and not allowing the Filter Team to conduct a proper review. It then produced the unfiltered material to the co-defendants . . . ." (Mot. at 13.) Tellingly, the Moving Defendants cite nothing to support their version of facts other than their own speculation. Indeed, they cannot cite any support because their purported facts are false. As explained herein, the Filter Team *did* conduct a filter review—albeit imperfect—before the Seized Digital Materials were released to the Prosecution Team or produced to the Cardiologists.

Only in 2020, when the Seized Digital Materials were later loaded into the separate Relativity system and the Privilege Search Terms were run again out of an abundance of caution, did the Filter Team identify additional PPM, not caught in the CART system searches. (Starnes Decl. ¶ 5.) The government does not know precisely why this limited set of additional PPM was identified by the Privilege Search Terms in the Relativity system, but not earlier in the CART system, but it may very well stem from the fact that the Relativity system has more sophisticated algorithms for running searches, for locating files on an imaged device, or for opening archived and encrypted materials. In any case, the fact that additional PPM was later identified via additional searches in Relativity does not negate the fact that the Filter Team's initial PPM searches in the CART system were reasonable, fruitful, in good faith, and in compliance with the Search Warrant's filter protocol.

The Moving Defendants make much of the fact that, when the Prosecution Team served the December 2019 Native Production on the Cardiologists and other defendants, the Prosecution Team represented that the production contained "non-privileged, in-scope electronic documents." (Mot. at 17.) But this is consistent with the fact that the materials being released had been filtered using the Privilege Search Terms on the CART system. (Nimitsilpa Decl. ¶ 3.) The later discovery of some inadvertent deficiencies in the filter review on the CART system does not invalidate in retrospect the government's good-faith implementation of the Search Warrant's filter protocols.

The government's good faith and diligence is further demonstrated by the Filter Team's actions after it discovered the inadvertent production of PPM:  the Filter Team moved the documents tentatively identified as PPM to the filter side of Relativity and began investigating this potential issue. (Starnes Decl. ¶ 5.) Upon investigating the issue, the Filter Team wrote to counsel for all defendants notifying them of the issue and triggered a claw-back process by which the Cardiologists were requested to destroy the identified PPM on their systems or return their copies of the December 2019 Native Production to the Filter Team and receive a re-production with the PPM excluded. (*Id.*

8

¶ 6.) There was none of the prolonged, lackadaisical, or reckless approach that so troubled the courts in *United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012) and *United States v. Cote*, 72 M.J. 41 (A.F. Ct. Crim. App. 2013).

Unable to establish the "flagrant disregard" required for blanket suppression based on the government's actual conduct, the Moving Defendants have instead invented a fact pattern wholly untethered to reality. The truth, as explained above, is that the government has at all times acted diligently and in good faith to respect the Moving Defendants' purported privileges. The limited issues that have arisen as a result of the technical application of filter terms in two separate systems do not constitute government misconduct. Because there has been no government wrongdoing, much less flagrant disregard by the government, the Moving Defendants' request for blanket suppression of the materials seized pursuant to the Search Warrant should be denied.

**B.   Severance of the Moving Defendants Is Unjustified Because The Parties' Defenses Are Not So Antagonistic As to Outweigh the Federal Preference for Joint Trials.**

The Moving Defendants argue their trial must be severed from the trial of the Cardiologists under Rule 14(a) of the Federal Rules of Criminal Procedure because the Cardiologists have had access to the Moving Defendants' PPM, and, the Moving Defendants argue, they and the Cardiologists will be pursuing mutually antagonistic defenses and positions on privilege. (Mot. at 18–21.) The severance request should be denied.

1.   <u>The Moving Defendants have failed to justify severance.</u>

The Moving Defendants have not established that severance is appropriate here, because they have not shown any risk of serious harm that would outweigh the federal system's preference for joint trials of co-conspirators.

Whether to sever trials is within the sound discretion of the district court. *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993). In *Zafiro*, the Supreme Court emphasized the benefits of joint trials of co-defendants: they "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.* at

537. Indeed, the Supreme Court emphasized that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together" because "[j]oint trials play a vital role in the criminal justice system." *Id.* at 537. Joint trials are "particularly appropriate" for conspiracy charges. *United States v. Jenkins*, 633 F.3d 788, 807 (9th Cir. 2011) (cited by *United States v. Kinard*, 820 Fed. App'x 525, 527 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1508 (2021)). "[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540. Further, even where the risk of prejudice from a joint trial is high, the Supreme Court suggests that "less dramatic measures" than severance, "such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* at 539.

The Moving Defendants argue that severance should be granted if there is a "serious risk" that the joint trial would compromise a "specific trial right" of theirs or "prevent the jury from making a reliable judgment about guilt or innocence." (Mot. at 18.[8]) They say that severance "*is* appropriate" in cases where defendants assert "mutually antagonistic" defenses as well as "where defendants take antagonistic positions on the admission of privileged information those defenses." *Id.* (Emphasis added.) The Supreme Court disagrees, in fact holding that "[m]utually antagonistic defenses are *not* prejudicial *per se*." *Zafiro*, 506 U.S. at 538 (emphasis added). The defendant-petitioners in *Zafiro* urged the Supreme Court to adopt a bright-line rule mandating severance whenever codefendants have conflicting defenses, and the Court declined to do so. *Id.* Instead, the Court recognized that the government could simply argue (and the jury may find) that *each* of the defendants is guilty and that any possibility of prejudice could be cured with jury admonishments. *Id.* at 541.

The Moving Defendants also cite the Ninth Circuit's opinion in *United States v. Fernandez*, 388 F.3d 1199, 1241 (9th Cir. 2004), which outlined several factors a district

---

[8] Strangely, the Moving Defendants include a block quotation (Mot. at 18), supposedly from the *Zafiro* opinion, that does not appear on the cited page 538 of the opinion nor anywhere else in the opinion. They appear to be trying to quote an excerpt from page 539 of the opinion, but the quotation is inaccurate, leaving out some key words—particularly the word "only."

court should consider in ruling on a severance motion. (Mot. at 18.) These factors include:

> (1) whether the jury may reasonably be expected to collate and appraise the individual evidence against each defendant;
>
> (2) the judge's diligence in instructing the jury on the limited purposes for which certain evidence may be used;
>
> (3) whether the nature of the evidence and the legal concepts involved are within the competence of the ordinary juror; and
>
> (4) whether Appellants could show, with some particularity, a risk that the joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.

*Id.*

The Moving Defendants emphasize the fourth *Fernandez* factor, *i.e.*, risk as to a specific trial right or an unreliable jury judgment (Mot. at 18), but the Ninth Circuit in *Fernandez* actually suggested that the first two factors—*i.e.*, whether the jury may reasonably assess the individual evidence against each defendant and the judge's diligence in instructing the jury as to limited purposes for which certain evidence may be used—are the "most important in this inquiry." *Id.* Thus, in *Fernandez*, the Ninth Circuit determined that the jury could reasonably have assessed the individual evidence against each defendant in light of the "careful and frequent limiting instructions to the jury" provided by the district court and held that the district court did not abuse its discretion when it denied the certain defendants' motions to sever. *Id.* at 1243. The *Fernandez* opinion further noted that "a joint trial is particularly appropriate where the co-defendants are charged with conspiracy, because the concern for judicial efficiency is less likely to be outweighed by possible prejudice to the defendants when much of the same evidence would be admissible against each of them in separate trials." *Id.* at 1242.

A joint trial is appropriate here because the Moving Defendants and the Cardiologists are alleged to have acted together in a conspiracy to commit health care fraud and wire fraud. (Indictment, Dkt. 1 at 1–11.) As such, much of the same evidence will be admissible against both the Moving Defendants and the Cardiologists, such as

evidence of the billing procedures used at GCC, Medicare claims data, and the records of individual patients. Under *Fernandez*, this overlap of allegations and evidence weighs strongly against severance. 338 F.3d at 1242. Moreover, even in the hypothetical instance where the defendants have antagonistic defenses, or if some set of evidence is only admissible against certain defendants, under *Fernandez*, severance is not appropriate and any possible prejudice can be remedied through "careful and frequent limiting instructions to the jury." *Id.* at 1243. *See also Zafiro*, 506 U.S. at 539 (stating that "less dramatic measures" than severance, "such as limiting instructions, often will suffice to cure any risk of prejudice" from joint trial).

2.    The Moving Defendants have failed to demonstrate that the parties' respective defenses are so irreconcilable as to justify severance.

Moreover, the Moving Defendants have failed to meet the high burden of demonstrating specifically that any Cardiologist defense theories that may arise from Cardiologists' exposure to the Moving Defendants' PPM are so antagonistic to Moving Defendants' defenses as to justify severance.

Rule 14 does not require severance when co-defendants present mutually antagonistic defenses. *See Zafiro*, 506 U.S. at 538 ("Mutually antagonistic defenses are not prejudicial *per se*."). "To warrant severance on the basis of . . . irreconcilable and mutually exclusive [defenses]," defendants must show that "acquittal of one codefendant would necessarily call for the conviction of the other." *United States v. Angwin*, 271 F.3d 786, 795 (9th Cir. 2001), *overruled on other grounds by United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007). *See also United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996) (defendant bears the burden of showing "that the core of the codefendant's defense is so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant"); *United States v. Hernandez-Orellana*, 539 F.3d 994, 1002 (9th Cir. 2008) (finding defendant failed to meet "heavy burden" of showing her defense theory was sufficiently antagonistic to that of her co-defendant such that acquittal of codefendant would "necessarily call" for

defendant's conviction). It is insufficient to show that the defenses were merely antagonistic, or that "one defendant [desired] to exculpate himself by inculpating a codefendant." *Throckmorton*, 87 F.3d at 1072.

The Moving Defendants have failed to meet that extremely high standard. Instead, the Moving Defendants argue that four hypothetical points the Cardiologists may make at trial, initially set forth in the Cardiologists' motion to compel (Dkt. 335), will necessarily involve the admission at trial of the Moving Defendants' PPM, and that that justifies severance. (Mot. at 20–21.) Yet those four points do not demonstrate, as required by the Ninth Circuit in *Angwin*, 271 F.3d at 795, that the acquittal of the Cardiologists would necessarily call for the conviction of the Moving Defendants. Nor do the Moving Defendants demonstrate, as required by the Ninth Circuit in *Throckmorton*, 87 F.3d at 1072, that the "core" of the Moving Defendants' and the "core" of Cardiologists' defense theories are "so irreconcilable" as to require severance. And fundamentally, none of the four hypothetical points necessarily turn on the admission into evidence of any PPM of the Moving Defendants and their counsel.

Taking the points as detailed by the Moving Defendants:

<u>First</u>, the Moving Defendants suggest that the Cardiologists intend to assert at trial that the Moving Defendants manipulated patient medical records without the Cardiologists' knowledge or consent, in order to validate GCC's Medicare billing practices. (Mot. at 20.) That assertion presumably would turn on admission of evidence of what was contained in the original patient billing records; of whether and how the billing records were altered and by whom; and of whether the Cardiologists were aware of such alterations. Assuming, *arguendo*, that there were any relevant communications in the PPM inadvertently released to the Cardiologist, it would be unnecessary and irrelevant to admit evidence of the contents of legal advice that the Moving Defendants received from their attorneys about billing practices.

<u>Second</u>, the Moving Defendants suggest the Cardiologists intend to assert at trial that they were not participants in the Moving Defendants' attorney-client

communications as evidence that Cardiologists were not within the inner-circle of GCC management. (*Id.*) Again, to the extent the Cardiologists intend to make this point at trial, and were permitted to do so by the Court, they would presumably do so via evidence that they were *not* involved in any communications with GCC attorneys (including even with the introduction of evidence that would be contained on a typical privilege log about the participants in particular communications). It would be unnecessary and irrelevant to admit evidence of the contents of Moving Defendants' communications with their attorneys.

Third, the Moving Defendants suggest the Cardiologists intend to assert at trial that the Moving Defendants' attorney-client communications reflect that the Moving Defendants worked with their counsel to ensure that GCC was compliant with rules and regulations; that Moving Defendants believed they were in compliance with rules and regulations; and that this belief "trickled down" to the Cardiologists. (*Id.*). Such an assertion would not represent an "irreconcilable" conflict between the Moving Defendants' and the Cardiologists' defenses (*see Throckmorton*, 87 F.3d at 1072); it would represent a mutually consistent and beneficial defense, so would not be a reason to sever the trials.

Fourth, the Moving Defendants suggest the Cardiologists intend to assert at trial that they were not informed that the Moving Defendants were not following the advice of their lawyers regarding establishing GCC protocols. (Mot. at 21). Again, such an assertion presumably would turn on admission of evidence of what the Cardiologists were told or not told by the Moving Defendants about what advice the Moving Defendants were getting from their attorneys (which would not be privileged); it would not turn on admitting the contents of the Moving Defendants' communications with their attorneys.

In short, the examples the Moving Defendants cite of reasons the Cardiologists may seek to introduce the Moving Defendants' purportedly privileged information either would not actually involve the admission of the contents of any privileged

communications or would not constitute a situation where the Moving Defendants' and Cardiologists' positions are in irreconcilable conflict.

The Moving Defendants also assert that, even if no PPM is admissible at trial, severance is required because the Cardiologists have developed a defense strategy based on their review of the PPM. (Mot. at 19, 21.) Yet, assuming, *arguendo*, this to be the case, the Moving Defendants cite no authority for their assertion that a trial should be severed based merely on one party's development of a trial strategy based on exposure to PPM, rather than on what evidence will actually be admitted at trial. Surely, the Cardiologists' expected arguments, as the Moving Defendants describe them (*id.* at 20–21), would have been obvious arguments to make regardless of any exposure to Moving Defendants' PPM. Fundamentally, the Moving Defendants have failed to demonstrate how hypothetical review of their PPM by the Cardiologists in any way shows that acquittal of the Cardiologist defendants would necessarily call for the conviction of the Moving Defendants, which is the required showing. *See Angwin*, 271 F.3d at 795; *Throckmorton*, 87 F.3d at 1072.

### 3.   The request for severance is premature.

In any case, to the extent the Moving Defendants' severance request is based on the purportedly improper disclosure of the Moving Defendants' PPM to the Cardiologists, the request is premature. Several issues are still in flux that will be determinative of whether the Cardiologists' exposure to Moving Defendants' PPM was actually improper.

First, in November 2021, the Cardiologists filed a motion to compel discovery from the Moving Defendants, arguing that they are entitled under the principles announced in *Brady v. Maryland*, 373 U.S. 83 (1963), to production of the Moving Defendants' assertedly privileged documents, regardless of any privileges applicable to the documents, based on the claim that the documents are material to the Cardiologists' defenses. (Dkt. 335.) That motion was heard by the Court, but not decided, on January 24, 2022, (Dkt. 370), and remains pending. The Court may determine, as a result

of that motion, that the Cardiologists' need to seek discovery of the Moving Defendant's PPM in search of potential exculpatory evidence trumps the Moving Defendants' privilege rights and that the PPM inadvertently disclosed by the government would have needed to be disclosed anyway. While this would not be determinative of whether the Moving Defendants' trial should be severed, the lack or presence of improper disclosure of PPM may be a factor the Court would consider in deciding on severance.

Second, it must still be determined whether the PPM over which the Moving Defendants have asserted privileged is, in fact, privileged. The Moving Defendants have served privilege logs that the government (and, as the government understands, the Cardiologists) regards as vague and overbroad. (Starnes Decl. ¶ 7.) The Moving Defendants are currently revising their privilege logs to provide more information about the bases for their privilege assertions and, presumably, removing privilege assertions that are determined to be baseless. (*Id.* ¶ 8.) Following this, the parties will confer and possibly litigate disputes about which documents are properly claimed as privileged. (*Id.* ¶ 8.) Until the Court can assess with specificity the particular PPM that the Moving Defendants assert will prejudice them unless trial is severed, it is premature to determine whether severance is appropriate.

### C. An Evidentiary Hearing Is Unnecessary.

The Moving Defendants also tack on to their Motion a request for an evidentiary hearing (Mot. at 21–24) "to determine the full extent of the breach of the Moving Defendants' attorney-client privilege, gauge the full extent of the prejudice caused by the breach, and examine whether further remedies are appropriate" (*Id.* at 22). A district court's denial of an evidentiary hearing on a motion to suppress is reviewed for abuse of discretion. *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000). "An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *Id.* However, a defendant offering a "boilerplate" and "conclusory" declaration is not sufficiently specific to create a contested issue of fact.

*United States v. Rodriguez-Hernandez*, No. 05-50077, 2007 WL 135686, at *1 (9th Cir. Jan. 16, 2007). "A hearing will not be held on a defendant's pre-trial motion to suppress merely because a defendant wants one. Rather, the defendant must demonstrate that a 'significant disputed factual issue' exists such that a hearing is required." *Howell*, 231 F.3d at 621 (quoting *United States v. Harris*, 914 F.2d 927, 933 (7th Cir. 1990)). "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a desire to cross-examine." *United States v. Marcello*, 731 F.2d 1354, 1358 (9th Cir. 1984) (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)) (internal quotation marks omitted). *See also United States v. Woodson*, No. CR 11-00531 WHA, 2011 WL 5884913, at *6 (N.D. Cal. Nov. 23, 2011) (denying a defense request for an evidentiary hearing because "mere refusal to accept the uncontradicted evidence does not create a material issue of fact").

In their Motion, the Moving Defendants offer a factual recap of the Search Warrant and production of discovery in this case, including ongoing communications with the government's Filter Team and the government's attempt to claw-back inadvertently produced PPM. (Mot. at 3–10.) Having done so, the Moving Defendants then simply offer the conclusory speculation that because there was inadvertently produced PPM, the government *must have* failed to follow the filter protocol in the Search Warrant. (*Id.* at 10.) The Moving Defendants offer this claim with no foundation whatsoever, and in blithe denial of the continued communications the Moving Defendants have had in this this case with the government's Prosecution Team and Filter Team about the filter process *over years*. The Moving Defendants even allude to this extensive communication and coordination in their Motion, before summarily dismissing it to conclude that the government failed to follow the filter protocol. (*See, e.g.*, Mot. at 4–6.) The Moving Defendants' offering of conclusory speculation does not justify an evidentiary hearing. Moreover, the questions the Moving Defendants have stated they seek to pose at a hearing focus on the government's filter process (Mot. at 22–24), which the government has detailed, *supra*, and in the attached Declarations. There are no

17

grounds for why any live testimony would materially differ from the Declarations. Moreover, none of the questions the Moving Defendants seek to pose at a hearing relate to potential prejudice from the Cardiologists' use of any PPM, and thus there are no contested issues of fact as to the Cardiologists. For these reasons, Moving Defendants' request for an evidentiary hearing should be denied.

**IV.   CONCLUSION**

For the foregoing reasons, the Court should deny the Motion.